

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-09-00384-CR

JUAN ENRIQUE GOMEZ                                                      APPELLANT

V.

THE STATE OF TEXAS                                                              STATE

------------

## FROM COUNTY CRIMINAL COURT NO. 1 OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. INTRODUCTION

Appellant Juan Enrique Gomez challenges his conviction for violation of a protective order.[2]  After pleading not guilty, a jury found Gomez guilty and assessed punishment at 365 days' confinement in the Denton County jail.  The trial court sentenced Gomez accordingly.  In four issues, Gomez challenges the

------------

[1]See Tex. R. App. P. 47.4.

[2]See Tex. Penal Code Ann. § 25.07(a)(1) (Vernon Supp. 2010).

sufficiency of the evidence to support his conviction; the effectiveness of his trial counsel; and the constitutionality of Texas Penal Code section 25.07. We will affirm.

## II. BACKGROUND

Gomez and the complainant in this case, Pamela Beauchamp, divorced in July 2007. Later, in October 2008, Gomez agreed to a protective order that forbid him from communicating directly with Beauchamp in a threatening or harassing manner. Gomez also agreed that he would not engage in conduct directed toward Beauchamp, including following her or engaging in conduct that would be reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass her.

Donnal Watts testified that he lives in Hackberry, Texas, and that Beauchamp is a family friend. Watts said that Beauchamp and her teenage daughter lived with him and his parents at the time of the events that led to the charges against Gomez. According to Watts, he met Gomez when he would come into the family's grocery store. He knew that Gomez and Beauchamp were once married and that Gomez was the father of her children—Gomez and Beauchamp's son lives with Gomez. Watts testified that on January 22, 2009, he returned home from work at 11:00 a.m. and stepped out of his car when he encountered Beauchamp leaving. Watts said that Beauchamp told him she was going to a job interview. Watts testified that as he and Beauchamp talked, he

2

saw Gomez pull up to a nearby stop sign in a truck. By Watts's account, Gomez began to yell obscenities at them from his truck. Watts said that Gomez was approximately 200 feet from them when he yelled. Gomez then drove away.

Watts said that he and Beauchamp were discussing whether to call the police when Gomez again drove up, yelled at them that he was "going to get [them]," and made a "thumb on the neck" gesture. Watts also demonstrated for the jury the gesture Gomez allegedly made. Watts testified that Gomez sped away and that he and Beauchamp believed Gomez was gone. Watts said that he waited outside to observe Beauchamp drive away. Watts testified that three to four minutes after he had gone inside, he heard a tapping sound. He went to the front door and found Beauchamp crying hysterically. Watts said that Beauchamp told him that Gomez had tried to hit her vehicle with his truck and that Gomez had actually run her off the road. Beauchamp told Watts that after her vehicle came to a stop, Gomez came up to her car and yelled that he was going to kill her.

Beauchamp testified that she was leaving Watts's house for a job interview when Watts arrived and they stood outside talking. Much like Watts's account, Beauchamp said that Gomez drove by multiple times as she and Watts talked. She said that Gomez yelled and made gestures that scared her. Beauchamp demonstrated for the jury a gesture that Gomez allegedly made during one of his drive-bys. Beauchamp averred that after two to three passes, she believed

3

Gomez was gone. She left in her vehicle. As she approached a nearby taco stand, Beauchamp said that Gomez pulled out in front of her and forced her off the road and into a ditch. She said that he had his windows down and yelled at her "I'm going to get you, you 'F'—ing bitch." Beauchamp called 911.

On cross-examination, Beauchamp said that she had told her son that she would dismiss her case against Gomez if Gomez would surrender his house to her and give her some money. Beauchamp acknowledged that both Watts and Gomez had thrown rocks at each other in the recent past. Beauchamp testified that she had lost her job because Gomez continually came into the grocery store where she worked in an in-store bank. Beauchamp said that Gomez lived a mile away from where she did and that he did not need to drive by her home or the store where she formerly worked in order to get to his home.

Gomez testified. He said that he did not violate the protective order on January 22, 2009. He also said that he had been the subject of harassment by Watts, who allegedly had followed him and threatened to kill him. Gomez said that Watts had previously attempted to entice him to drive in front of the home where Beauchamp lived by throwing rocks at him. According to Gomez, he had to drive by the store near Beauchamp's home in order to drive home. He said that although he frequented the store with his kids, he knew Beauchamp was there and he did not come near her or speak to her. Citing that Beauchamp was the mother of his children, Gomez said he never stalked her, never threatened

4

her, and never shouted obscenities toward her. Gomez said that Beauchamp called the police several times, wrongfully telling them he had a gun. Gomez testified that he believed her motivation was to have him put in jail so that she could take custody of their son. The jury found Gomez guilty. This appeal followed.

## III. DISCUSSION

### A. Sufficiency of the Evidence

In his first and second issues, Gomez argues that the evidence is legally and factually insufficient to support his conviction for violation of a protective order. The court of criminal appeals recently held that there is "no meaningful distinction between the *Jackson v. Virginia* legal-sufficiency standard and the *Clewis* factual-sufficiency standard" and that "the *Jackson v. Virginia* standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. All other cases to the contrary, including *Clewis*, are overruled." *See Brooks v. State*, No. PD-0210-09, 2010 WL 3894613, at *8, *14 (Tex. Crim. App. Oct. 6, 2010). Accordingly, we will apply the same standard of review to both of Gomez's sufficiency complaints.

### 1. Standard of Review

In reviewing the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution in order to

determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778.

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 2075 (2009). Thus, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1131 (2000). Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must presume that the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778.

**2.    Application**

6

Viewing all of the evidence in the light most favorable to the prosecution, the evidence shows that Gomez violated the protective order that forbid him from intentionally and knowingly communicating with Beauchamp.  Multiple witnesses' testimony evinces that on January 22, 2009, Gomez drove by Watts's house, where Beauchamp lived and was standing in the yard, and shouted obscenities and threatened her.  Multiple witnesses also demonstrated the threatening gesture Gomez made toward Beauchamp.  Beauchamp's testimony demonstrates that shortly after having shouted these threats and obscenities, Gomez drove his vehicle toward Beauchamp's vehicle, forcing her off the road.  According to Beauchamp's testimony, almost immediately Gomez again threatened her.  We conclude that the jury could have found beyond a reasonable doubt that Gomez violated the protective order as described in the information.  *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778.  We overrule Gomez's first and second issues.

## B.    Effective Assistance of Counsel

In his third issue, Gomez argues that he received ineffective assistance of counsel.  But Gomez did not allege ineffective assistance of counsel in the trial court, neither by objection nor through the vehicle of a motion for new trial, and Gomez does not claim that the conduct of his trial counsel was so deficient that no reasonable trial counsel would have engaged in it as a reasonable trial strategy.  Filing a motion for new trial based on ineffective assistance of counsel

7

would have afforded the trial court the opportunity to conduct a hearing as to any alleged failures. As such, the record is not sufficiently developed to allow us to do more than speculate as to the strategies of Gomez's trial counsel. *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994) (reasoning that when the record is silent as to possible trial strategies employed by defense counsel, a reviewing court should not speculate on the reasons for those strategies); *see also Downs v. State*, 244 S.W.3d 511, 515 (Tex. App.—Fort Worth 2007, pet. ref'd) (same). Thus, we cannot determine that Gomez was denied effective assistance of counsel. Gomez has a more appropriate remedy in seeking a writ of habeas corpus to allow him the opportunity to develop evidence to support his complaints. *See Robinson v. State*, 16 S.W.3d 808, 810 (Tex. Crim. App. 2000) (noting that a postconviction writ proceeding is the preferred method for gathering the facts necessary to substantiate an ineffective assistance of counsel claim). We overrule Gomez's third issue.

### C. Constitutional Challenge

In his fourth issue, Gomez challenges the constitutionality of penal code section 25.07. *See* Tex. Penal Code Ann. § 25.07. Specifically, Gomez argues that the statute is unconstitutional on its face because it is overbroad and vague. We conclude that Gomez forfeited this issue.

The Texas Court of Criminal Appeals has held that "a defendant may not raise for the first time on appeal a facial challenge to the constitutionality of a

8

statute." *Karenev v. State*, 281 S.W.3d 428, 434 (Tex. Crim. App. 2009). Here, there is no indication in the record that Gomez raised a facial challenge to the constitutionality of section 25.07 at trial. Gomez has thus failed to preserve this issue on appeal. *See Ex parte Chamberlain*, 306 S.W.3d 328, 332 (Tex. App.— Fort Worth 2009, pet. granted) (holding that appellant was prohibited from raising facial challenge to constitutionality of statute for first time on appeal). We overrule Gomez's fourth issue.

## IV. CONCLUSION

Having overruled all four of Gomez's issues, we affirm the trial court's judgment.

BILL MEIER
JUSTICE

PANEL: WALKER, MCCOY, and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: December 9, 2010